**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **WILLIAM BANDY, TOBY LEE, LUSHAWN SMITH,** | ) | |
| **MARK WILLIAMS CLARENCE STOKES,** | ) | |
| **FRED THOMPSON, CLARENCE ROYSTER,** | ) | |
| **ANTAWON L. MARSHAL, NERVILLE COX** | ) | |
| **and CLEOPHUS MARSHALL,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **10-cv-5304** |
| v. | ) | **Magistrate Judge Cox** |
| | ) | |
| **ROADWAY EXPRESS, INC. and YRC, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF INTERVENING PLAINTIFFS' REQUEST FOR
CERTIFICATION OF §1981 SETTLEMENT CLASS AND FOR PRELIMINARY
APPROVAL OF CONSENT DECREE**

Plaintiffs, William Bandy, Toby Lee, Lushawn Smith, Mark Williams, Clarence Stokes, Fred Thompson, Clarence Royster, Antawon L. Marshal, Nerville Cox, and Cleophus Marshall ("Named Interveners")[1] submit this Memorandum in support of their Motion for Preliminary Approval of Consent Decree and in support of Named Intervenors' request for certification of a § 1981 settlement class in case 10-cv-5304, for injunctive relief. The Consent Decree (the "Decree") before the Court resolves all claims asserted in both this class action and in the underlying Title VII pattern and practice cases brought by the EEOC. The proposed decree, attached hereto as Exhibit A, represents over four years of vigorously contested litigation.

---

[1] Pursuant to the Parties' Proposed Consent Decree, William Bandy, Toby Lee, Lushawn Smith, Mark Williams, Clarence Stokes, Fred Thompson, Clarence Royster, Antawon L. Marshal, Nerville Cox, and Cleophus Marshall have been defined as "§ 1981 Named Plaintiffs."

The Decree provides extensive injunctive relief which should ensure that YRC operates its Chicago Heights terminal in a nondiscriminatory manner and provides $10,000,000 in monetary relief. All administrative costs are being borne by the defendant, as well as the costs related to the hiring of experts and restructuring of YRC's EEO, discipline and job assignment practices.

By this motion, § 1981 Named Plaintiffs seek, *inter alia*, preliminary approval of the proposed Consent Decree, including § 1981 Named Plaintiffs' proposed attorneys' fees, preliminary certification of a settlement class for injunctive relief purposes only in the § 1981 action, and the approval of the parties' proposal as to the form and method of class notice with discretionary opt-out procedure in the §1981 action. The following memorandum describes in detail the reasons why § 1981 Named Plaintiffs believe that preliminary approval of the Decree, the §1981 Settlement Class, and the Class Notice are in the best interests of the class, and are consistent with the provisions of Rule 23.

The parties have attached hereto as Exhibit B, a proposed Order conditionally approving the Consent Decree subject to a Rule 23 Fairness Hearing.

## SUMMARY OF THE LITIGATION

This litigation began in September 2006 when the EEOC filed a race discrimination case (Case No. 06 C 4805) on behalf of a class of African-American workers employed by defendant Roadway Express at its Chicago Heights facility.[2] The EEOC's complaint alleges that Roadway violated Title VII by creating a racially hostile work environment for its African-American workers, and by subjecting its African-American workers to racially discriminatory terms and conditions of employment, including discrimination in discipline and work assignments.

---

[2] As of March 2009, the Roadway Express facilities and the Yellow Freight facilities were combined. All facilities now operate under the corporate name "YRC, Inc.". Roadway Express, Inc. no longer exists as a separate corporate entity.

A group of ten class members represented by Kinoy, Taren & Geraghty, P.C. intervened in that action and also alleged discrimination at the Elk Grove Village facility, adding claims under 42 U.S.C. § 1981 based upon the same operative facts on behalf of a class of Roadway dockworkers.  In their complaint, the ten named class members sought injunctive relief and punitive damages, but not compensatory damages.

 In 2008, the EEOC filed an additional complaint (Case No. 08 C 5555) alleging that Roadway similarly violated Title VII at its Elk Grove Village facility.

Between 2006 and the present, the parties to the litigation exchanged approximately a million documents and took over 100 depositions.  The parties also engaged in private mediation on two occasions and then engaged in a lengthy, court-supervised mediation process.  Settlement was negotiated in the face of serious economic difficulties encountered by the Defendant.  This settlement process enabled the parties to better understand each other's positions and, ultimately, to reach an agreement to settle the *Bandy* case as well as the consolidated litigation brought by the EEOC.

The proposed settlements of both the EEOC litigation and the § 1981 class litigation are embodied in one Consent Decree with both individual and joint provisions.  For administrative purposes, upon motion of the EEOC and by Order of the Executive Committee of the District Court on August 24, 2010, the class action claims have been severed from the EEOC Title VII pattern and practice complaint and given a separate case number, 10-cv-5304.  This Consent Decree will resolve all claims brought against YRC, Inc., on behalf of African-American dockworkers, including switchers, seniority lists and casual employees  in the § 1981 case and a more extensive group of claimants in the EEOC case, including claims for both money and equitable relief.

**THE STANDARDS FOR PRELIMINARY APPROVAL**

The Seventh Circuit has described judicial review of a proposed settlement proposal as

follows:

District court review of a class action settlement proposal is a two-step process. The first

step is a preliminary, pre-notification hearing to determine whether the proposed settlement is

'within the range of possible approval.' This hearing is not a fairness hearing; its purpose, rather,

is to ascertain whether there is any reason to notify the class members of the proposed settlement

and to proceed with a fairness hearing. [Citation omitted] If the district court finds a settlement

proposal 'within the range of possible approval,' it then proceeds to the second step in the review

process, the fairness hearing. Class members are notified of the proposed settlement and of the

fairness hearing at which they and all interested parties have an opportunity to be heard.

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,* 616 F.2d 305, 314 (7th Cir.1980), overruled

on other grounds by *Felzen v. Andreas,* 134 F.3d 873 (7th Cir.1998); *Kaufman v. American*

*Express Travel Related Services Co.*, 264 F.R.D. 438 (N.D. Ill. 2009).

Ultimately, a district court may approve a class action settlement only if it is "fair,

reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(c). In this circuit, the factors considered in

determining the  fairness of class action settlements, include: the strength of the plaintiffs' case

compared to the amount of the defendant's settlement offer; an assessment of the likely

complexity, length and expense of the litigation, an evaluation of the amount of the opposition to

the settlement among affected parties, the opinion of competent counsel, and the state of the

proceedings and the amount of discovery completed at the time of the settlement. *Synfuel*

*Technologies, Inc. v. DHL*, 463 F.3d 646, 653 (7th Cir. 2006); *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996).[3]

## THE BANDY CLASS SETTLEMENT AGREEMENT

To effectuate a fair, reasonable and comprehensive settlement, the *Bandy* class has agreed to settle its claims in exchange for comprehensive injunctive relief designed to reform the workplace by implementing effective EEO policies and by eliminating the alleged discriminatory effects of defendant's discretionary discipline and job assignment procedures. In addition, class members who file a timely, valid claim for damages will be entitled to compensation paid from from a $7,685,000 settlement fund established and administered pursuant to the EEOC's Title VII pattern and practice case.

## SUMMARY OF INJUNCTIVE RELIEF

YRC will agree to be bound by the Consent Decree for no less than 3 and up to 5 years. As described below, the Consent Decree will obligate YRC to implement a number of procedures that affect the way it handles complaints of discrimination and harassment, the way it disciplines its employees and the manner in which it hands out job assignments to dock workers. The Consent Decree will obligate YRC to undertake various other activities related to equal employment opportunity including the following:

**Court Appointed Monitor.** Upon Final Approval of this Consent Decree, the Court will appoint a Monitor, as set forth in the Consent Decree, to oversee the implementation by YRC of the terms of this Decree. The Monitor will have authority under Court supervision to assess and monitor YRC's compliance with the terms of this Decree and to report to the EEOC, YRC, and to the Court regarding YRC's compliance. The programs and procedures subject to oversight by

---

[3] While this case meets Fed. R. Civ. P. 23 standards, an action by the EEOC is not subject to the requirements of Fed R. Civ. P. 23. *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 324 (1980).

the Monitor will include the efficacy of YRC's complaint procedures; the quality of

investigations undertaken in response to complaints; the status of all required training;

implementation of changes in anti-harassment and anti-discrimination policies; fairness in work

assignments; fairness in disciplinary practices; fairness in breaks and downtime; and the overall

environment with regard to race harassment and/or race discrimination.

**Revised EEO Policies.**  Within (30) days of Final Approval of the Decree, YRC will

present for EEOC review, revised employment opportunity policies and procedures, including its

anti-discrimination policies, its anti-harassment policies, and its policy for investigating

complaints in effect at YRC's Chicago breakbulk operation. YRC's policy against race

discrimination and harassment, shall at a minimum:

(a) specifically prohibit all discrimination against employees on the basis of race.

(b) inform employees that they may raise complaints with supervisors, managers, or

Human Resources representatives located on site, in addition to the other avenues currently

stated in YRC's non-discrimination policy, including the EthicsPoint toll-free hotline,

EthicsPoint internet website, or direct correspondence with YRC's Office of General Counsel.

(c) inform employees that complaints of discrimination will be investigated thoroughly

and promptly and shall provide that employees who violate the policy are subject to discipline up

to and including discharge.

(d) require the designation of a full-time employee at YRC's Chicago break bulk dock

operation, with responsibility for promptly investigating complaints of discrimination and

harassment and for implementing the terms of this Consent Decree.

(e) require that all supervisors and managers who receive performance reviews, will be

evaluated, among other criteria, based upon their compliance with YRC's anti-harassment and

anti-discrimination policies.

**Race Harassment/Discrimination Training.** Within (90) days of final approval of the Decree, and each year thereafter under the Decree, YRC will require all of its employees who implement human resources policies at Chicago Heights to undergo new racial harassment training, to be approved by the EEOC.

**Nondiscriminatory Work Assignments.** Within thirty (30) days from the final approval of this Decree, YRC will engage a consultant, approved by the EEOC ("the Work Assignment Consultant"), to assist it in reviewing and revising the company's work assignment policies and practices at YRC's Chicago Heights facility. The consultant will make recommendations as to the methods by which YRC can modify its current procedures or adopt new procedures designed to ensure that the procedures are fair and do not have the intent or effect of discriminating against any employee on the basis of race. The recommendations will be implemented unless it would require a material change to the CBA or would impose a substantial hardship or if YRC determines that it is unable to implement a recommendation for good cause, provided however, YRC provides an alternative recommendation that is consistent with the goals of the recommendations of the consultant.

**Nondiscriminatory Discipline Procedures.** Within thirty (30) days from the final approval of this Decree, YRC will engage a consultant approved by the EEOC, ("the Disciplinary Practice Consultant"), to assist it in reviewing and revising YRC's disciplinary policies and practices at YRC's Chicago bulk dock operation. The consultant will make recommendations as to the methods by which YRC can modify its current procedures or adopt new procedures designed to ensure that the procedures are fair and do not have the intent or effect of discriminating against any employee on the basis of race. The recommendations will be

7

implemented unless it would require a material change to the CBA or would impose a substantial hardship or if YRC determines that it is unable to implement a recommendation for good cause, provided however, YRC provides an alternative recommendation that is consistent with the goals of the recommendations of the consultant.

**Supervisor Accountability.** YRC agrees that it will impose discipline up to and including suspension, demotion and termination upon any supervisor or manager who is found to have engaged in race harassment or discrimination.

**Maintaining Records and Reports.** YRC will maintain records of all matters related to the implementation of this Consent Decree and will make those records available to the EEOC upon reasonable request. YRC will furnish to the monitor and parties, on a semi-annual basis, a report with regard to compliance with the Consent Decree.

## SATISFACTION OF DUE PROCESS

The notice to class members which contains the right to file objections to the § 1981 settlement or file a Notice to opt-out of the § 1981 settlement, set forth in Exhibit A to the Consent Decree, satisfies the requirements of due process and of Fed.R.Civ.P. Rule 23(e), as applicable. See *Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir. 1980); *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 103-4 (7th Cir. 1987).[4]

The threshold requirement concerning class notice is whether the means employed to distribute the notice was reasonably calculated to apprise the class of the pendency of the action, of the proposed settlement, and of the class members' right to opt out or object. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 159, 173 (1974); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). The mechanics of the notice process are left to the discretion of the court,

---

[4] The consent decree also contains a provision that allows YRC to either file a motion to void the settlement or a motion opposing final approval if the number of opt-outs is inconsistent with the purpose and goals of the Consent Decree (Paragraph 25).

subject only to the broad "reasonableness" standards imposed by due process. A notice of settlement will be adjudged adequate where the notice (a) describes the essential terms of the settlement; (b) announces the date, time and place of the settlement hearing and the method for objection to and/or opting out of the settlement; (c) explains the procedures, if any, allocating and distributing settlement funds; (d) provides information regarding attorneys' fees; and (e) prominently displays the address of class counsel and the procedure for making inquiries. *Manual For Complex Litigation Third,* ¶ 30.212 (3rd Ed.1995). *See, e.g., Air Lines Stewards and Stewardesses Ass'n Local 550 v. American Airlines,* 455 F.2d 101, 108 (7th Cir.1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *accord Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

The proposed Notice in this case more than satisfies all requirements. The language of the Class Notice was negotiated and has been agreed to by the parties. The proposed Notice is written in simple terminology and includes: (1) a description of the Class; (2) a description of the claims asserted in the class action; (3) a description of the Settlement, including the amount of fees paid to private counsel; (4) the requirement for filing a claim form in the EEOC case and/or for exercising the right to opt-out of the § 1981 class 5) the names of counsel for the §1981 class; (6) the fairness hearing date; (7) an explanation of eligibility for appearing at the fairness hearing; and (9) the deadline for filing objections to the §1981 settlement.

The proposed Notice provides §1981 Class Members with sufficient information to make an informed and intelligent decision whether to object to the Settlement. As such, it satisfies the content requirements of Rule 23. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S. Ct.

2965 (1985).

The proposed method for dissemination of the Notice satisfies all due process requirements. The Decree provides for first class mailing of the Class Notice and Claim Forms. The forms will be sent to the most recent address shown in the defendants' electronic records. In addition, the Claims Administrator will verify the accuracy of the addresses by using the national change of address data base. The Notice will outline the allegations of the case and announce the date of the fairness hearing. In sum, the contents and dissemination of the proposed Notice constitutes the best notice practicable under the circumstances, and complies fully with the requirements of Rule 23.

**Discretionary Opt-out Procedures Fully Protect All Class Members' Interests**

As in *Williams v. Burlington Northern, Inc.*, 832 F.2d 100 (7th Cir. 1987), an employment discrimination class action certified pursuant to Rule 23(b)(2), the Consent Decree gives all class members the opportunity to voice any objections to the proposed settlement and also provides the opportunity for a class member to opt-out of the settlement. This procedure ensures constitutionally adequate due process and is the equivalent due process protection that would be accorded to a Rule 23(b)(3) member. *Id* at 104.

**The Court Should Certify a Settlement Class Pursuant to Rule 23(b)(2)**

The Supreme Court has made clear that even when the Court determines that a settlement is fair under the strictures of Fed. R. Civ. P. 23(e), it still must consider whether a class can be preliminarily certified under Rules 23(a) and (b). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619-21 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999);

**The Section 1981 Complaint**

The complaint in intervention, as originally filed and as now amended, asserts three

claims, each of which alleges a pattern of racially discriminatory conduct against African-

American dockworkers which would violate 42 U.S.C. § 1981.  The claims are as follows:

> a.  The defendant has maintained and tolerated a racially hostile environment on
> its docks by failing to investigate and/or take prompt and effective action to
> prevent racial harassment, including allowing persistent racially offensive
> graffiti, racially hostile language, repeated racial intimidation in the form of
> hangman's nooses directed at Black employees, and the maintenance of a
> racially segregated dock where African-American dockworkers were further
> harassed by supervisors through discriminatory discipline and discriminatory
> work assignments. (Am. Compl. in Intervention ¶¶ 27–44, A-35–38.)[5]

> b.  The defendant has engaged in a pattern and practice of disciplining African-
> American dockworkers at disproportionately greater rates than non-African-
> Americans, based upon their race.  This conduct was both intentional and the
> result of an alleged discretionary policy that allowed supervisors to disparately
> issue discipline to dockworkers engaging in similar conduct. (Am. Compl. in
> Intervention ¶¶ 49–59, A-39–41.)

> c.  The defendants engaged in a pattern and practice of assigning African-
> American dockworkers the most physically exertional, least desirable trailers
> to strip (unload) or stack (reload), increasing their chances of injury and
> reducing their productivity. (Am. Compl. in Intervention ¶¶ 45–48, A-38–39.)

The § 1981 Named Plaintiffs are entitled to certification of a settlement class pursuant to

Rule 23(b)(2) of the Federal Rules of  Civil Procedure, for the purpose of obtaining the class-

wide injunctive relief contained in the Consent Decree, in accordance with *Allen v. Int'l Truck &*

*Engine Corp.*, 358 F.3d 469 (7th Cir. 2004); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th

Cir. 1999); *Smith v. Nike Retail Services, Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006); *Palmer v.*

*Combined Ins. Co. of Am.*, 217 F.R.D. 430 (N.D. Ill. 2003); and consistent with the recent *en*

*banc* decision of the Ninth Circuit in *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir.

---

[5] All citations to Exhibits referenced in this Memorandum will identify the document from which the Exhibit was
derived and will contain a page number to the separate Appendix (A-__) filed along with this Memorandum, for
easy access to the document.

2010).

Pursuant to 42 U.S.C. § 1981, the settlement class would be defined as follows:

> All African-American employees of the Defendant at its Chicago Heights or Elk Grove Village facilities employed as a dockworker, including switcher, seniority list, percenter and casual positions, at any time between April 9, 2003 and the present.[6]

As set forth in detail in this memorandum, this case is appropriate for certification of a settlement class under Rule 23 of the Federal Rules of Civil Procedure. Extensive discovery has established that this case meets the requirements of numerosity, commonality, typicality, and adequacy of the representation set forth in Rule 23(a).

Class certification is warranted under Rule 23(b)(2) because plaintiffs seek declaratory and equitable relief on behalf of all class members. Eight of the ten Intervening Plaintiffs continue to be employed by the defendant and will benefit directly from injunctive relief.

Finally, the § 1981 Named Plaintiffs request that, pursuant to Rule 23(g), the Court appoint Jeffrey L. Taren, Joanne Kinoy, and Miriam N. Geraghty of Kinoy, Taren & Geraghty, P.C., as § 1981 class counsel to represent the § 1981 settlement class.

**Facts Supporting Class Certification**

In April of 2003, African-American dockworker Kenneth Comer filed a class charge of racial discrimination with the EEOC alleging that a racially hostile atmosphere permeated the workplace at the Chicago Heights terminal of Roadway Express. (Comer EEOC Charge, A-1.) Comer alleged that he had observed racial graffiti in the bathrooms and had discovered the first of a series of alleged hangman's nooses placed throughout the facility. (Comer Dep. 41:5–13, A-176.)

---

[6] Four years prior to the April 10, 2007 filing of the interveners' class action complaint in intervention. *See Jones v. Donnelley & Sons Inc.*, 541 U.S. 369, 124 S. Ct. 1836 (2004).

Comer alleged that his complaints to the company were all but ignored. The company's EEO policy at the time required that all complaints of racial harassment be communicated in writing to Roadway's Office of General Counsel in Akron, Ohio.[7] (Am. Compl. in Intervention ¶ 27, A-35.) (Comer Dep. 23–24, A-174.) Mr. Comer's allegations were not unique to him. During the period 2000 until the main dockworker bathroom was torn down in 2005 or 2006, class members alleged that racist graffiti was present on a daily basis in the bathrooms. (Espinoza Dep. 176, A-197; Franklin Dep. 104, A-201; Gee Dep. 154, A-215; Harvey Dep. 48, A-231; McNair Dep. 66, A-289.)[8]

Over 167 African-American dockworkers came forward to the EEOC during the course of this litigation to assert claims nearly identical to those presented by the named Intervening plaintiffs. (EEOC Answer to Interrogs., A-8–26.)

A.      **The Class Representatives**[9]

The § 1981 Named Plaintiffs seeking to be designated class representatives are all long-time, dedicated dockworkers who claim to have experienced similar racial hostility and discriminatory treatment throughout their employment. Plaintiffs Bandy, Lee, Williams, Thompson, Royster, A. Marshall, Cox, and C. Marshall were current employees as of July 27, 2010, who, as of the filing of the initial complaint in intervention, worked on the dock for an average of 14 years. (Am. Compl. in Intervention ¶¶ 3–4, 6–12; A-29–30.) Plaintiffs Smith and Stokes worked for Roadway eleven and twelve years respectively as of 2007, but have subsequently left the company. (Am. Compl. in Intervention ¶¶ 3, 7, A-29; Stokes Dep. 27, A-

---

[7] Roadway Corporation was not acquired by Yellow Corporation, now known as YRC, Inc., until December 2003.

[8] Many supervisors testified that they never saw any racial graffiti in the bathrooms.

[9] The Plaintiffs have attached to this Memorandum, as an Appendix, excerpts from the thirty-one Plaintiff and class member depositions (referenced herein as "(___ Dep. ___, A-___)"; Declarations from class members who were not deposed; Declarations from former Roadway supervisors; and Deposition excerpts of Roadway supervisors.

332; Smith Dep. 37, A-322.)

All of the § 1981 Named Plaintiffs have worked at the Chicago Heights terminal. *Id.* Interveners Stokes, Lee, Smith, and Williams have also worked one or more bid shifts at Elk Grove Village.[10] Each of the named class representatives, like many of the class members, has alleged in the complaint and has testified under oath at their depositions, to experiencing the same racially hostile environment and the same discriminatory treatment with regard to discipline and work assignments. And each has been subjected to the same Roadway policies, or lack thereof, with regard to discipline, work assignment and EEO matters, thus justifying class certification.

**B.     Roadway's Common Policies**

Roadway has contended throughout this litigation that it has developed and applied uniform EEO, discipline and job assignment policies across all shifts and within the two terminals. (Albaniak Dep. 156, A-162; Gee Dep. 302, A-216.) Policies with regard to anti-harassment investigations, racial graffiti, and EEO training were developed by "corporate" in Akron, Ohio and communicated to the terminal manager and human resources employees at

---

[10] Every six months, dockworkers, all of who are represented by the Teamsters, bid on the terminal and shift they wish to work. Terminal and shift assignments are determined based upon seniority. Individual job assignments, on the other hand, including where on the dock an employee works, are determined by a supervisor, referred to at various periods of time as a foreman, supervisor, Terminal Operations Manager, or Customer Service Coordinator. (Lynch Dep. 14, A-258.) The class members work two basic jobs. They are assigned to "strip" a trailer, meaning they take the items off of a filled trailer and stage it by a door to be "stacked" on another trailer and sent to its target destination; or they are a "stacker", reloading an empty trailer. It is management's decision to decide who is going to stack and who is going to strip. (Rosa Dep. 35, A-307; Mott Dep. 73, A-293.) In at least one area of the dock, now known as the RSC, a dockworker may be required to "cross-load", meaning he/she takes items off a filled trailer and immediately stacks it on an outgoing trailer. (Harvey Dep. 134, A-234; Williams Dep. 27, A-356.) Depending upon the "load," a trailer may be required to be unloaded by hand (a carton load, tire load, carpet load, Hasbro playground equipment load) or it may be entirely on pallets. (Cox Dep. 157, A-190; Franklin Dep. 130, A-202; Gee Dep. 137, A-214; Nudo Dep. 61, A-298.) The dock operates 24/7, with class members working differing and often overlapping shifts. While they are working, the plaintiffs are supervised by three types of supervisors strategically placed around the dock; a "strip" supervisor, who hands out strip assignments; a "stack" supervisor, who supervises the stacking process; and a walking supervisor, who roams the dock making sure people are working. (Rosa Dep. 35, A-307.) These supervisors are in turn managed by an Assistant Terminal Manager and a Terminal Manager. Since supervisors' shifts rotate and dockworkers' shifts change constantly, each of the plaintiffs and class members has been supervised at various times by many of the supervisors.

Chicago Heights, and are now centrally developed by YRC corporate in Overland, Kansas. (Harrison 30(b)(6) Dep. 100–02, A-226–27.) Disciplinary practices and job assignment practices were also supposed to be uniform regardless of the supervisor on duty at any given time. (See *e.g.*, *Espinoza Dep.* p. 158, A-196.)

With regard to Roadway's EEO policies, plaintiffs contend that those policies were ineffective, incomplete and generally ignored, allowing a class-wide racially hostile environment to permeate the dock for years. With regard to defendant's discipline and work assignment policies, plaintiffs contend that these policies gave dock supervisors discretion to discipline some workers and not others for identical conduct or to assign easy load trailers to their buddies and punish others. Plaintiffs further contend that this discretion, which was attested to by almost every African-American employee who was deposed or who gave statements in this case, resulted in racially discriminatory treatment and had an adverse impact on all Black dock workers. See e.g. *Latino Officers Ass'n City of New York v. City of New York*, 209 F.R.D. 79, 88 (S.D.N.Y. 2002) ("The delegation of discretionary authority to supervisors for disciplinary purposes constitutes a policy or practice sufficient to satisfy the commonality requirement.").

## C.     The Class-wide Racially Hostile Environment Claim

§ 1981 Named Plaintiffs contend that the alleged racial stratification on the dock at Chicago Heights manifested itself in repeated racially hostile incidents affecting every Black employee working the dock. These alleged incidents spanning the statute of limitations period and Roadway's alleged failure to adequately address the racially hostile environment constitute a common practice justifying class certification. The § 1981 Named Plaintiffs' allegations of a racially hostile environment, as set forth in their First Amended Complaint and as more fully developed in discovery, can be categorized as follows:

15

1. **Failure to Adequately Investigate Alleged Noose Incidents**

There is testimony and documentation and/or physical evidence regarding at least seven (7) instances where alleged nooses have been displayed on the dock. § 1981 Named Plaintiffs contend that the company had been placed on notice with regard to these nooses but failed to prevent them from reoccurring. These alleged nooses began to appear at Chicago Heights around 2002 (after a series of noose incidents in Aurora, Colorado 1998),[11] and were last discovered in November 2007. Deposition testimony revealed that one or more of the noose incidents were seen or heard about by almost every African-American dockworker employed by Roadway during the limitations period.[12] § 1981 Named Plaintiffs contend that defendant's response to each of these incidents was ineffective, which in and of itself is sufficient to establish a common practice, which violates both Title VII and 42 U.S.C. § 1981.

**2. Tolerance of Alleged Racist Graffiti**

§ 1981 Named Plaintiffs' deposition testimony and written statements contend that for many years within the limitations period racist graffiti was ubiquitous in the bathrooms. § 1981 Named Plaintiffs contend that Roadway was ineffective in preventing the graffiti from reappearing despite the fact that Dockworkers and supervisors frequently used the same bathrooms. Plaintiffs allege that few investigations were undertaken and that no one has ever been disciplined for racist graffiti. Plaintiffs contend that as late as May 2007, racist graffiti directed at one of the plaintiffs was allowed to remain in the bathroom at Elk Grove Village for

---

[11] *See* Sue Lindsay, *Hunting Down An Antagonist. Reward Offered for Leads After 3rd Noose Found on Company's Loading Docks*, ROCKY MOUNTAIN NEWS, June 23, 1998.

[12] *See* Archibald Dep. 63, 77, A-164, 165; Bandy Dep. 100, A-168; Comer Dep. 41, A-176; Cox Dep. 174–77, A-192–93; Hill Dep. 139, A-237; Joiner Dep. 123, A-241; Lee Dep. 174, 184, A-254, 255; Lilly Dep. 123, A-245; Mabon Dep. 66, A-261; C. Marshall Dep. 221, 257, A-277, 279; McGhee Dep. 96, A-281; Monson Dep. 76, A-293; Pearman Dep. 94, A-300; Peete Dep. 104, A-303; Ray Dep. 99, A-305; Royster Dep. 238, A-318; Smith Dep. 200, A-330; Stokes Dep. 137, 139, A-338; Thompson Dep. 215, A-341; Webster Dep. 18–21, A-348–49; Wiley Dep. 73, A-353; M. Williams Dep. 153, A-362.

months.  (Smith Dep. 181, A-328.)

Each of the named class representatives detailed in his Answers to Interrogatories and depositions allegations that Roadway allowed racial graffiti to remain on the bathroom walls creating a demeaning and hostile atmosphere at the facility. (A-64–109.)

At some point in 2005, Roadway posted a written policy in the bathroom notifying its employees that the presence of graffiti was against Roadway policy  Plaintiffs contend that this effort was "too little, too late" and was ineffective to remediate the problem in a timely fashion.

### 3. Offensive Racial Language Was Tolerated on the Dock

§ 1981 Named Plaintiffs allege that racial language was often heard on the dock with little or no consequences.  Employees allege they were called "nigger," "boy," "Chicken George," and other racially offensive words.  As late as 2008,  a supervisor allegedly referred to class member J. Rogers as "Florida Evans"—a female character on the TV show "Good Times"—and allegedly posted an offensive picture of the actress with Mr. Roger's name on it and  made an offensive reference referring to him.  (A-110; Hill Dep. 157, A-239; C. Marshall Dep. 246–47, A-278; Lee Dep. 164, A-253; McGhee Dep. 96, A-281; Royster Dep. 234, A-317; Webster Dep. 86, A-351.)

Plaintiffs believe that most of these acts, and others, were known to supervisory personnel and tolerated.

### D.    Disparities in Disciplinary Action Based upon Race

§ 1981 Named Plaintiffs have alleged that the dock supervisors at Roadway had discretion to discipline or not discipline an individual dockworker for a myriad of subjective offenses and that discretion was exercised in a manner that had a significant adverse effect upon

African-American dockworkers.[13] They also have asserted a claim that Roadway intentionally discriminated against them because of their race with regard to discipline.

Plaintiffs contend that the deposition testimony of the named interveners and class members with regard to discriminatory discipline can be fully supported by plaintiffs' experts. However, even in the absence of objective data, the plaintiffs' anecdotal testimony is sufficient to support certification of a class-based claim of racial discrimination with regard to discipline. Class members contend that White supervisors regularly forced the Black workers to return to work from their breaks while allowing their White counterparts to remain in the break room to finish their poker games. (Bandy Dep. 57, A-167; Cox Dep. 144, A-189; Lee Dep. 134, A-251; A. Marshall Dep. 144, A-264; C. Marshall Dep. 114, 137, A-273–74; Royster Dep. 150, A-315; Smith Dep. 121–22, A-325; Stokes Dep. 109, A-336; Thompson Dep. 198, A-340; Williams Dep. 101, A-359.) (*See* Decl. of Former Roadway Supervisor Willie Stewart ¶ 3, A-158) ("I also observed that there was a dual standard for White and Black dockworkers with regard to their breaks. White supervisors would force African-American dockworkers who were often playing dominos to get back to work and would allow White dockworkers who were on the same break to remain in the break room and play poker past their break time.")

§ 1981 Named Plaintiffs allege that Black workers were disproportionately issued disciplinary letters, leading to suspension and termination, for conduct that was ignored when committed by White dockworkers. This includes talking to each other on the dock, failing to

---

[13] Both the Roadway managers and front line supervisors have confirmed that each supervisor had the discretion to issue a disciplinary letter or to verbally counsel an employee without issuing discipline, when he observed a work rule violation. For example, former terminal manager Galando testified that he was aware supervisors did not issue Warning Letters each time they observed a violation. (Galando Dep. 99, A-209.) Labor manager Tom Milinowski testified that it was "up to the discretion of the supervisor" whether to issue a disciplinary letter in a given situation. (Milinowski Dep. 41, A-291.) *See also* Assistant Terminal Manager Mott Dep. 56, A-295; Terminal Manager Siefert Dep. 107–08, A-320; Roadway Supervisors Franklin Dep. 56–7, A-199–200; Gee Dep. 45, 52–3, A-211–13; Grissom Dep. 78–9, A-224; and Harvey Dep. 86–7, A-232.

wear a seat belt, smoking on the dock and being tardy.

Misuse of company time was the catchall phrase, which allowed a Roadway supervisor to issue discipline when he believed the employee was wasting time. (Albaniak Dep. 84, A-161.)

Each of the § 1981 Named Plaintiffs, echoing the complaints of the class members, testified to instances where they believed they were given a "Misuse of Company Time" disciplinary letter for racially discriminatory reasons. (Bandy Dep. 57, A-167; Cox Dep. 113, 131, A-187–88; Lee Dep. 58, 73, 208; A-248, 250, 256; A. Marshall Dep. 152, A-265; C. Marshall Dep. 102, 108, A-271–72; Royster Dep. 125, A-314; Smith Dep. 92, A-323; Williams Dep. 83, A-358.)

## E.     Racial Disparities in the Assignment of Work

§ 1981 Named Plaintiffs contend that Black workers were disproportionately given the most exertional, least desirable job assignments where they had to load and unload trailers by hand instead of with the assistance of a forklift. Plaintiffs further contend that these class-wide practices were ignored by management and were fostered by Roadway's admitted policy of allowing its supervisors wide discretion to choose which trailers would be unloaded by which employees.

Witnesses testified that the term "brother load" referred to the type of trailer load that class members contend was customarily assigned to an African-American dockworker. Class members understood the term to refer to a trailer that was more difficult or exertional or generally undesirable. Each of the intervening plaintiffs testified that he and other African-American dockworkers were selectively and intentionally assigned to unload the least desirable freight.

**THE FACTUAL ALLEGATIONS ADEQUATELY MEET THE REQUIREMENTS OF RULE 23 FOR CLASS CERTIFICATION**

"A claim of a racially hostile work environment is an appropriate subject of class certification, for by definition . . . it involves conduct targeted at a group. The issues of what occurred at a particular venue, whether it rose (or fell) to the level necessary to be actionable under the law, and whether the company should be held liable because of the action or inaction of management, provide a common nucleus of operative fact and law sufficient to satisfy Rule 23(a)(2)'s commonality requirement." *Adams v. R.R. Donnelley & Sons*, ___ F. Supp. 2d ___, ___ 2001 WL 336830 (N.D. Ill. Apr. 06, 2001).[14]

Following the Supreme Court's guidance that "suits alleging racial or ethnic discrimination are often by their very nature class suits, involving class wrongs [where] common questions of law or fact are typically present," *East Texas Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 405 (1977), the Seventh Circuit has affirmed that allegations of a hostile environment which collectively "constitute one unlawful employment practice" are appropriate for class treatment. *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 472 (7th Cir. 2004); *Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894, 896 (7th Cir. 1999). The instant case presents claims nearly identical to similar racial and sexual harassment cases in our district where classes have been certified. *Smith v. Nike Retail Services, Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006) (class certified where African-American plaintiffs claimed they were subjected to a variety of harassing conduct from different supervisors and coworkers, including racial epithets, and that Nike applied workplace rules more stringently and subjected them to increased discipline); *Markham*

---

[14]The plaintiffs in A*dams v. Donnelly* asserted claims very similar to those found in the case at bar. The African-American employees in *Adams* offered anecdotal evidence that White coworkers subjected them to racial epithets; racist graffiti was left open and visible for long periods of time; KKK references were made to intimidate plaintiffs and management did little or nothing to prevent the harassment or punish the offenders. *Id.* They also asserted that they were subjected to disparities with regard to discipline because of their race. *Id.*

*v. White*, 171 F.R.D. 217 (N.D. Ill. 1997) (class action certified where plaintiffs alleged

harassment and hostile work environment); *Bell v. Woodward Governor Co.*, 2005 WL 23340

(N.D. Ill. Jan. 04, 2005) (class on behalf of 117 employees alleging discrimination in terms and

conditions of employment. Class certified under 23b(2) certification for injunctive relief and

under 23b(3) for determination of liability for damages, but not for damages); *Palmer v.

Combined Ins. Co. of Am.*, 217 F.R.D. 430 (N.D. Ill. 2003); *Warnell v. Ford Motor Co.*, 189

F.R.D. 383 (N.D. Ill. 1999) (class action certified where plaintiffs alleged harassment and hostile

work environment); *Toney v. Rosewood Care Ctr., Inc. of Joliet*, 1999 WL 199249 (N.D. Ill.

Mar. 31, 1999) (class certified on behalf of African-American employees who alleged

maintenance of a racially hostile environment, discriminatory enforcement of work rules and

disparities with regard to job duties).[15]

 As will be seen, all of the elements of Rule 23 are satisfied with regard to the § 1981

Named Plaintiffs' claims.

**THE APPLICABLE LEGAL STANDARD**

 Pursuant to FED. R. CIV. P. 23(a), the plaintiffs bear the burden of showing: (1) that the

class is too numerous to make joinder practicable; (2) that there are common questions of fact

and law; (3) that the claims or defenses of the representative parties are typical of the claims or

defenses of the class; and (4) that the representative parties will fairly and adequately protect the

interests of the class. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 151 n.2

(1982). Plaintiffs must also meet one of the requirements listed under Rule 23(b).

---

[15] Judge Coar's decision to certify a class in *Toney* was later upheld by Judge Kennelly upon the Defendants' Motion to Decertify the Class. *Toney v. Rosewood Care Center, Inc.*, 2001 WL 322413 (N.D. Ill. 2001). Unfortunately for the plaintiffs, the case was later dismissed by Judge Kennelly for their failure to timely file a pretrial order, a decision upheld by the Seventh Circuit. *Toney v. Rosewood Care Center, Inc. of Joliet*, 62 F. App'x 697, 2003 WL 1827215 (N.D. Ill. 2003).

Although it is § 1981 Named Plaintiffs' burden to demonstrate that the case satisfies the requirements of Rule 23, they need not demonstrate that they will prevail on the merits in order to satisfy Rule 23. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). In determining whether a party has carried that burden, a court need not accept all of the complaint's allegations as true. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). In deciding whether to certify a class, the court may "make whatever factual and legal inquiries [that] are necessary under Rule 23." *Id.* at 676; *see also Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010).[16] Finally, district courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979); *Payton v. County of Carroll,* 473 F.3d 845, 847 (7th Cir. 2007). The court's role is to determine whether the plaintiffs are asserting a claim which, assuming its merits, would satisfy the requirements of Rule 23. *See* H. NEWBERG, NEWBERG ON CLASS ACTIONS, § 24.13 at 60 (3d ed. 1992); *Eisen*, 417 U.S. at 178.

### § 1981 Named Plaintiffs Satisfy The Numerosity Requirements Under Rule 23(a)

### 1. Numerosity Requirement Met

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). To determine whether joinder is impracticable, courts

---

[16] The Ninth Circuit, *en banc,* recently affirmed, in large part, the certification of a nationwide class of female employees at Wal-Mart retail stores based on allegations of sex discrimination (pay and promotion) pursuant to Title VII. *Dukes*, 603 F.3d at 622–23. In *Dukes,* the court, after an extensive review of the legal standards for class certification in the different Appellate Circuits, held that the district court's inquiry and analysis was sufficient to support its decision to certify the large classes. *Id.* The Ninth Circuit held that when considering class certification, the district courts must perform a rigorous analysis to insure that the prerequisites of Rule 23 have been met. *Id.* at 581. Such analysis may, although not always, require the court to look beyond the pleadings, "even to issues overlapping with the merits of the underlying claims." *Id.* The dissent challenged the logic of certifying a potential class of 1.5 million employees employed in 3,400 stores based on the allegations of six named plaintiffs who had worked in 13 different stores. *Id.* at 629 (Ikuta, C.J., dissenting). The dissent argued that the "plaintiff's failure to present significant proof of a discriminatory policy or practice of Wal-Mart would make it possible to conclude that 1.5 million members of the proposed class suffered similar discrimination." *Id.* at 628. Class certification in the instant case is far simpler and more direct than that in *Dukes*. Plaintiffs herein seek to represent a discrete and manageable group, and have provided more than sufficient evidence establishing the Rule 23 criteria.

must consider the circumstances unique to each case. *Swanson v. Am. Consumer Indus.*, 415 F.2d 1326, 1333 (7th Cir. 1969). These circumstances include whether class members are able to bring individual suits and whether it is judicially efficient for the court to try such individual suits. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56 (N.D. Ill. 1996). As noted by the Seventh Circuit, "to require a multiplicity of suits by similarly situated small claimants would run counter to one of the prime purposes of a class action." *Swanson*, 415 F.2d at 1333.

Additionally, the § 1981 Named Plaintiffs must provide some evidence or reasonable estimate of the number of class members. "[W]hile there is no threshold number requiring or barring a finding of numerosity, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Toney,* 1999 WL 199249 at *6; *see also Chandler v. Southwest Jeep-Eagle Inc.*, 162 F.R.D. 302, 307 (N.D. Ill. 1995) (permissive joinder deemed inappropriate when class members number 40 or more); *Hendricks-Robinson v. Excel Corp.*, 164 F.R.D. 667, 671 (C.D. Ill. 1996) (joinder considered impracticable where class consists of 38 members).

The class in the instant case consists of all African-American dockworkers who have been employed at the Chicago Heights or Elk Grove Village facilities since at least April 9, 2003. Defendants have provided Plaintiffs with documents showing that the class contains approximately 476 current and former employees.[17]

### 2. Commonality Requirement Met

Rule 23(a)(2) requires that there be questions of law or fact common to the class. FED. R. CIV. P. 23(a)(2). Commonality is satisfied where the named plaintiffs' claims of discrimination are based on policies, patterns or practices of defendant that affect not only them, but also which

---

[17] According to data provided in discovery, approximately 272 African-American employees worked on the dock as "casual" employees, meaning they were not yet considered full-time, union dockworkers. At least 205 African-American dockworkers have been employed full-time on the dock since 2000.

similarly victimize the putative class members.  The threshold of commonality, it has been noted

by the courts, is a "'low hurdle' easily surmounted." *Scholes v. Stone, McGuire & Benjamin,*

143 F.R.D. 181, 185 (N.D. Ill. 1992) (quoting *Wesley v. GM Acceptance Corp.*, 1992 WL 3594,

at *10 (N.D. Ill. March 20, 1992)).  "[T]he cases have not been overly restrictive in setting out

the requirements for commonality, with the existence of a common nucleus of operative fact

usually being enough to qualify . . . ." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van

Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005) (citing *Rosario v. Livaditis*, 963 F.2d 1013,

1018 (7th Cir. 1992)).  In order to satisfy this requirement, there needs to be just one common

question of law or fact. *Arenson v. Whitehall Convalescent & Nursing Home*, 164 F.R.D. 659,

663 (N.D. Ill. 1996).  Moreover, factual variations among the experiences of class members do

not preclude meeting the commonality requirement for class certification. *Rosario*, 963 F.2d at

1017–18.

Finally, the fact that the United States has filed suit asserting a pattern and practice of

racial discrimination supports the conclusion that common issues of fact and law exist. *Wright v.

Stern*, 2003 WL 21543539, at *6 (S.D.N.Y. July 09, 2003).

The alleged pattern of discrimination, along with the repeated use and tolerance of racial

slurs and epithets in the workplace also serves as the common nucleus of operative fact related to

Plaintiffs' claim that Roadway created a hostile work environment for African-American

dockworkers.  Class treatment in this case is wholly appropriate. *Edmonson v. Simon,* 86 F.R.D.

375, 380 (N.D. Ill. 1980) ("Where an across-the-board or permeating policy of discrimination is

alleged in a class action, the requirement under Rule 23(a)(2) of commonality is satisfied.").

Moreover, in the present case, defendant's corporate headquarters delegated authority for

the implementation and enforcement of its corporate practices and policies regarding harassment,

job assignments, and discipline/termination to its local management team. Plaintiffs contend that

this delegation of authority was used in a racially biased manner against African-American

employees, as demonstrated by the anecdotal evidence detailed above, and is sufficient to establish

Rule 23(a)'s requirement of commonality. *See Smith v. Nike Retail Services, Inc.*, 234 F.R.D. 648,

661–63 (N.D. Il. 2006); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir. 1999)

(delegation to supervisors of discretionary authority to make employment decisions without

sufficient oversight gave rise to common questions sufficient to satisfy Rule 23(a)(2)); *Rossini v.

Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986) (system in which promotion decisions are

made by one central group satisfies Rule 23(a)); *Binion v. Metropolitan Pier & Exposition Auth.*,

163 F.R.D. 517, 523–26 (N.D. Ill. 1995) (commonality existed when plaintiff provided testimony

and evidence showing the operation and effect of an identifiable discriminatory discipline policy);

*Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 373–74 (N.D. Ill. 1997).

### 3. Typicality Requirement Met

The issue of typicality is closely related to that of commonality. *Rosario v. Livaditis*, 963

F.2d 1013, 1018 (7th Cir. 1992). To satisfy the typicality requirement of Rule 23(a)(3), the

named plaintiffs must have the same interest and suffer the same injury as the class members.

*Falcon*, 457 U.S. at 156. The named representatives' claims should have the same essential

characteristics as the claims of the class. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225,

232 (7th Cir. 1983). § 1981 Named Plaintiffs' claims are typical if (1) they arise from the same

event, practice, or course of conduct as the claims of the other class members, and (2) the claims

are based on the same legal theory. *Id*. There can be factual distinctions between the named

plaintiffs' claims and the class members' claims: similarity of legal theory is sufficient. *Id*. In

fact, Rule 23(a)(3) "requires neither complete coextensivity nor even substantial identity of

25

claims." *Owner-Operator*, 231 F.R.D. at 282. "Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996). "Whether the [employer's] management decisions originated from a common decision maker or individual department heads is of little consequence, '[s]ince the named plaintiffs have allegedly suffered various forms of employment discrimination, they share common factual and legal issues with other black employees who were or are subject to these alleged policies of discrimination.'" *Daniels v. Fed. Reserve Bank of Chicago*, 194 F.R.D. 609, 615 (N.D. Ill. 2000) (quoting *Lawson v. Metro. Sanitary Dist.*, 102 F.R.D. 783, 792 (N.D. Ill. 1983)).

Here, Defendant's alleged conduct toward the African-American dockworkers supports a finding that the discriminatory conduct caused a common injury typical of the class's claims as required by Rule 23(a)(3). Moreover, the claims of § 1981 Named Plaintiffs and the class members are based on the same legal theory; namely, that Roadway violated § 1981 by engaging in a pattern of disparate treatment that was so severe that it created a racially hostile work environment for all African-American employees in the Chicago Heights and Elk Grove Village terminals. Similarly, plaintiffs' claims with respect to discriminatory discipline and work assignment in violation of § 1981 meet the typicality component for the main class.

### 4. Adequate Representatives Requirement Met

Rule 23(a)(4) requires that named class representatives "will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This requires the demonstration of three elements: (1) the chosen class representatives cannot have antagonistic or conflicting claims with other members of the class; (2) the named representatives must have a sufficient interest in the

26

outcome to ensure vigorous advocacy; and (3) counsel for the named plaintiffs must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously. *Gammon v. GC Services Ltd. P'ship*, 162 F.R.D. 313, 317 (N.D. Ill. 1995). Indeed, "[t]he burden of demonstrating adequacy under this standard, nevertheless, is not a heavy one." *Nielsen v. Greenwood*, 1996 WL 563539, at *5 (N.D. Ill. Oct. 01, 1996) (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966)).

In this case, § 1981 Named Plaintiffs satisfy the elements of this requirement. They do not have antagonistic or conflicting claims with other members of the class. They all have worked, at various times, on the same dock, on similar shifts and for the same supervisors. All have performed identical duties and have been subjected to the identical work rules. Eight of the ten remain employed on the dock while two of the plaintiffs, like a portion of the §1981 class, are now former employees.

§ 1981 Named Plaintiffs also satisfy the second part of this prerequisite for class certification. They have a sufficient interest in the outcome to ensure vigorous advocacy. The burden of establishing this element is not difficult. A class representative need only possess general knowledge of the case and participate in discovery. *Thompson v. City of Chicago*, 2002 WL 10627, at *18 (N.D. Ill. June 11, 2002); *Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999).

Here, the § 1981 Named Plaintiffs certainly have "a sufficient interest" in the outcome of the case. All have a full understanding of the foundation of the case and each has responded to written discovery and submitted to a deposition. The ten § 1981 Named Plaintiffs have been actively involved in this case, appearing at a mediation session and giving a presentation, appearing at a settlement conference with the Court and spending endless hours with their

attorneys. This qualifies them as "conscientious representative plaintiffs" and satisfies this element. *Robles v. Corporate Receivables, Inc.*, 220 F.R.D. 306, 314 (N.D. Ill. 2004).

Finally, § 1981 Named Plaintiffs' attorneys are qualified and able to conduct the proposed litigation vigorously. § 1981 Named Plaintiffs' counsel have represented employees in discrimination and wage and benefit matters for close to thirty years and have acted as class counsel in numerous class action matters both in this state and nationwide. Attorney Taren is currently acting as co-class counsel in numerous nationwide lending discrimination cases including *Rodriguez v. National City Bank*, 08-cv-02509 E.D. Pa.; *Guerra v. GMAC*, 2:08-cv-1297-LDD E.D. Pa.; *Doiron v. HSBC*, 2:08-at-302, E.D. Cal.; and *Barrett v. Option One Mortgage*, 08-cv-10157 Dist. Mass.

Attorneys Taren and Geraghty were class counsel in the 6,000-employee arbitration class action *Gibson et al. v. Menards Inc.,* AAA 11 160 01891 05, subsequently JAMS No. 1340005813, recovering over $3,100,000.00 in back wages for former Menards employees. Attorneys Kinoy and Geraghty were class counsel in *Moreno v. DFG Foods*, 02 C 4019 (N.D. Ill.) (certified class action under the federal WARN Act resulting in class settlement agreement entered in August, 2003) and *Li v. DFG Foods*, 03 C 1167 (N.D. Ill.) (collective action under the FLSA resulting in class settlement agreement entered in August, 2003).

Kinoy, Taren & Geraghty was class counsel in the nationwide class action entitled *Dong Yi v. Sterling Collisions Centers, Inc.*, Case No. 04C-3138 (N.D. Ill.) (collective action under FLSA on behalf of nationwide class of auto body repair mechanics). Formerly, plaintiffs' counsel represented certified classes in numerous cases including: *Miller v. Spring Valley Properties*, 202 F.R.D. 244 (C.D. Ill. 2001) (class action under Fair Housing Act resulting in settlement in March, 2002); *Tracy v. City of Chicago*, 95 C 5714 (collective action under FLSA

on behalf of sergeants, lieutenants and captains in the Chicago Police Department); *Johnson v.*

*Reno*, No. 93-5364 (D.C. Cir.) (nationwide Title VII class action brought on behalf of 512

African-American FBI agents alleging racial discrimination in all areas of employment); *Dyer-*

*Neely v. City of Chicago*, 101 F.R.D. 83 (N.D. Ill. 1984) (class action under the federal

Rehabilitation Act on behalf of applicants for positions within the Chicago Police Department);

*Harris v. Gen. Dev. Corp.*, 126 F.R.D. 537 (N.D. Ill. 1989) (Title VII and § 1981 class action on

behalf of black employees denied jobs).

**D.      § 1981 Named Plaintiffs Satisfy Requirements Under Rule 23(b)**

As noted above, in addition to the requirements of Rule 23(a), a party seeking class

certification must also satisfy at least one of the three additional requirements specified in Rule

23(b).  In this case, § 1981 Named Plaintiffs have brought suit alleging that Roadway engaged in

a practice of racial discrimination affecting a large number of employees.  Plaintiffs sought both

injunctive relief and punitive damages.  Plaintiffs thus seek to have the class and subclasses

certified for the purpose of equitable relief under Rule 23(b)(2).  § 1981 Named Plaintiffs are not

seeking class certification with regard to damages since all damage claims will be adequately

addressed in the settlement of the EEOC Title VII pattern and practice case.

**1.  Rule 23(b)(2) Requirements Met**

Under Rule 23(b)(2), an action is suitable for certification whenever "the party opposing

the class has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a

whole."  FED. R. CIV. P. 23(b)(2).  § 1981 Named Plaintiffs satisfy this test.  As detailed above,

the heart of their allegations, as well as the EEOC's allegation, is that Roadway engaged in a

pattern of discriminatory behavior directed at African-American employees that affected every African-American employee who worked on the dock.

§ 1981 Named Plaintiffs seek declaratory and injunctive relief sufficient to end a pattern of discrimination and prevent future harm to plaintiffs and the class. As discussed in the Amended Complaint and the fact section above, YRC has acted on grounds generally applicable to the class. Moreover, § 1981 Named Plaintiffs seek systemic injunctive relief. As the Seventh Circuit explained in *Allen,* because systemic injunctive relief is sought in class actions alleging wide-spread discrimination, such relief will affect all African-American employees and not only the named plaintiffs. *Allen*, 358 F.3d at 471. Thus, the equitable aspects of the case are inherently class-wide. *Id.* The Court reasoned that class certification is preferable because "class certification obliges counsel (and representative plaintiffs) to proceed as fiduciaries for all [minority] employees, rather than try to maximize the outcome for these [named plaintiffs] at the potential expense of the other [minority employees] . . . ." *Id.* "A Rule 23(b)(2) class is especially appropriate [when] . . . the gravamen of the Amended Complaint is the elimination of discriminatory employment practices." *Lawson*, 102 F.R.D. at 793.

**THE CONSENT DECREE SHOULD BE APPROVED AS FAIR AND REASONABLE**

Federal courts look favorably upon the settlement class action lawsuits. *Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir.1996). However, the district court must give "careful scrutiny" to proposed class action settlements and must consider whether a given settlement is "fair, adequate, and reasonable, and not the product of collusion." *Mirfasihi v. Fleet Mortgage Corp.,* 450 F.3d 745, 748 (7th Cir.2006) (quoting *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir.2002)).

In order to evaluate the fairness of a settlement, a district court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Isby,* 75 F.3d at 1199. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006).

The "most important factor relevant to the fairness of a class action settlement" is the first one listed: "the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1132 (7th Cir. 1979) (citing the MANUAL FOR COMPLEX LITIGATION § 1.46 at 56 (4th ed.1977)).

**The Strength of Plaintiff's Case Compared to the Defendant's Settlement Offer**

In evaluating the proposed settlement of the § 1981 complaint, this Court should consider the complete package of relief being provided to the class as settlement of both the intervening class complaint and the EEOC complaints. The injunctive relief provided in the Consent Decree addresses every claim that was asserted by the plaintiffs. The *Bandy* class could safely compromise their claim for punitive damages knowing that the class has obtained what counsel and the Court believes to be the maximum amount of monetary recovery available through the EEOC settlement given the applicable insurance policies and YRC's well-documented financial condition.

It should also be recognized, that while § 1981 Named Plaintiffs felt confident about their ability to prevail in litigation, extensive discovery revealed that the defendant has substantial defenses to liability and damages. Defendant produced documents, videos and sworn deposition

31

testimony showing that it conducted extensive training in the area of EEO Procedures, adopted

EEO policies which it believed satisfied its obligations under Title VII and § 1981, investigated

claims of discrimination and responded to co-worker and other harassment appropriately.

Additional testimony revealed the significant challenges faced by Defendant in conducting

discrimination and harassment investigations in an environment where union-represented

employees refused to provide management with any information that might lead to the

termination or discipline of another union represented employee.  Finally, many defense

witnesses, supervisors, managers and white dockworkers denied the specific allegations of racial

harassment and discrimination.

Given the above, obtaining a gross settlement fund in the EEOC complaint of

$10,000,000 from which all claims and attorneys fees' would be paid, with $1,500,000 paid over

three years (due to financial considerations), is a  fair and equitable compromise by all parties

justifying approval of the within settlement.

**An Assessment of the Likely Complexity, Length and Expense of the Litigation**

Given the knowledge that the defendant has exceeded its $5,000,000 retention under its

insurance policy, it can safely be stated that over $6.5 million in combined attorneys' fees and

costs has already been expended by the parties in this case.   A trial that is estimated to take a

minimum of eight weeks is currently scheduled.  And expert discovery, which will by its nature

be expensive and complex, has yet to be completed.

Once the liability phase of the case has been tried, it could be necessary for the parties to

individually litigate damages for over 200 class members in individual hearings.  These factors

fully support the preliminary approval of the Consent Decree.

**The stage of the proceedings and the amount of discovery completed at the time of settlement**

As set forth earlier in the memorandum, discovery in the within case has been lengthy and voluminous with close to 100 depositions having been taken.  By this discovery, plaintiffs and defendant have been able to assess the strengths and weaknesses of their case.   A settlement at this stage in the proceedings is being undertaken with the full knowledge of the risks attendant to the pending trial.

**The Opinion of Competent Counsel**

All counsel involved in the within case are class action litigators with decades of experience specializing in discrimination law.  As a result of the evaluation of counsel on both sides, the settlement was reached as a means of fully resolving the cases without the burden or risks attendant with further litigation.    As long as a settlement is reached by experienced counsel in arm's length negotiations, significant weight must be given to the opinion of class counsel with regard to settlement.  *Lake v. First Nationwide Bank*, 900 F.Supp 726,732 (E.D. Pa. 1995); *Austin v. Pennsylvania Dep't of Corrections,* 876 F.Supp. 1437, 1472 (E.D.Pa.1995).

In evaluating the propriety of a proposed settlement, courts should consider the negotiating process by which the settlement was reached to determine whether that process was genuinely adversarial and not collusive. *Goldsmith v. Technology Solutions co.*, ____ F.Supp.2d ____, 1995 WL 17009594 (N.D. Ill. 1995).  As this court is aware, the settlement process in the within case has been "genuinely adversarial".  There is not a whiff of collusion that has permeated the air of this case.

**The Interveners' and Class Counsels' Attorneys' Fees Should Be Preliminarily Approved**

The Consent Decree allows payment of $1,500,000 in reduced attorneys' fees and costs to the firm of Kinoy, Taren & Geraghty P.C. for over 3,300 hours of work performed in these

33

consolidated cases on behalf of the interveners since 2007.  Though court approval of this amount is not required, since all moneys are being paid pursuant to the EEOC's Title VII pattern and practice case, private counsel believe that it is in all parties interests to submit their fees for preliminary approval, notify the §1981 class of the amount of fees and give §1981 class members an opportunity to assert any proper objections they may have.

Attached hereto as Exhibits C and D, are counsel's Petition for Attorneys' Fees and Costs, to be paid from the Bandy Settlement Fund, with accompanying Memorandum and Affidavits.  Private counsel has agreed to accept $1,500,000 in attorneys' fees and costs to resolve this case even though their current lodestar is in excess of $1,725,770.  Counsel has attached their detailed contemporaneous time and billing statements, affidavits and supporting materials establishing their current class action hourly rate and other relevant materials.

## I.      CONCLUSION

For the reasons set forth herein, plaintiffs respectfully request that this Court certify the §1981 Settlement class and grant preliminary approval to the parties proposed Consent Decree, subject to a final Rule 23 Fairness Hearing.

Respectfully submitted,

**/s Jeffrey L. Taren**
Joanne Kinoy
Miriam N. Geraghty
Kinoy, Taren & Geraghty P.C.
224 S. Michigan Ave. Suite 300
Chicago, IL60604
Tel: (312) 663-5210
Fax: (312) 663-6663
jtaren@ktglawyer.com
ktgtaren@aol.com